[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] OPINION
This is an appeal from the Trumbull County Court of Common Pleas. Appellant/cross-appellee ("appellant") Ivy Hill Condominium Association, appeals from a judgment in favor of appellee/cross-appellant ("appellee"), Metropolitan Home Investment Corporation. The Trumbull County Court of Common Pleas entered judgment against appellant on its counterclaim for an implied easement from an existing use, but granted appellant a remittitur, reducing appellee's jury award from $26,831 actual damages and $108,500 punitive damages, to $26,831 actual and $36,167 punitive.
This dispute concerns appellant's entry onto two separate parcels of land owned by appellee. The two properties are a 4.69 acre parcel and a .758 acre parcel ("Lantern Lane") across the street from the 4.69 acre parcel. By stipulation, appellant admitted that it had trespassed on the 4.69 acre parcel, but filed an amended counterclaim alleging that it had an implied easement from an existing use on Lantern Lane. This case was bifurcated for trial purposes, which resulted in a trial before the magistrate on appellant's amended counterclaim, and a subsequent jury trial on the issue of damages for appellant's trespasses.
In 1972, Building Systems Housing Corporation, Inc. ("BSHC") built condominium units on property it owned in Bazetta Township. In 1973, BSHC built condominium units which were known as Building No. 48 ("Bldg. 48") of Phase One-Stage F ("Stage F") of the Ivy Hills Condominium Association Declaration. During this construction, BSHC created a blacktop drive and parking lot on what is now appellee's .758 acre parcel of land, Lantern Lane. BSHC was the original owner of the land used in Stage F and the land used for Lantern Lane. Appellee's lot was originally intended by BSHC to provide ingress, egress, and parking for Bldg. 48 and for a condominium complex to be adjacent to appellant's Bldg. 48. BSHC intended to name appellee's .758 acre parcel "Lantern Lane." BSHC went bankrupt and the complex which Lantern Lane was to service was never developed, leaving it used only by Bldg. 48 residents for ingress, egress, and parking.
After the bankruptcy of BSHC, the Devon Group became the successor in interest to BSHC and began to complete certain units in appellant's condominiums and Bldg. 48, pursuant to BSHC performance bonds. In 1976, the Devon Group dedicated Stage F of the BSHC plan of development to appellant. At that time, Lantern Lane was used by Bldg. 48 unit owners as it had for the four years prior to that time. The Devon Group dedicated or conveyed title to portions of real property under the Fourth Amendment (in 1976) and the Fifth Amendment (in 1978) to appellant's Declaration of Condominium Ownership. Due to an error in the Fourth Amendment dedication, Lantern Lane was omitted from the dedication, which remained undetected at that time. The unit owners of Bldg. 48 continued to use Lantern Lane as their means of access and parking, as intended by BSHC. Later, the Devon Group transferred ownership of Lantern Lane and other contiguous lands to Associated Midwest, Inc. ("Midwest").
On October 1, 1984, appellee purchased approximately fifteen acres of land from Midwest. However, the deed transferring that property failed to include 4.69 acres of land sold to appellee, which went undetected until approximately June 1986. Also on October 1, 1984, appellee sold a 3.92 acre parcel of land, which was on the south side of Lantern Lane, to Brunswick Apartments. The magistrate determined that appellee's agent, Harold Tryon ("Tryon"), knew or should have known that Lantern Lane was being used to serve as ingress, egress, and parking for Bldg. 48 at the time of its fifteen acre purchase from Midwest.
The magistrate made the following findings of fact, which were adopted by the trial court, and which appellant has not disputed: (1) in 1984, appellant's Board of Directors ("Board") acknowledged, through its executive minutes, that it did not own the land designated as "Lantern Lane"; (2) in 1992, appellant's Board once again acknowledged, through its minutes, that it may have to make another road or access to the condominiums, if a judgment was not rendered in its favor; (3) on April 27, 1993, appellant's Board acknowledged that it could build a drive and parking lot on its own property if it could not get an easement for Lantern Lane; (4) on May 13, 1993, appellant's Board again admitted that it did not own Lantern Lane and debated the feasibility of purchasing it; and (5) Lantern Lane's blacktop was in bad condition.
At the hearing, appellant's witness, Andrew Yount ("Yount"), testified that it was feasible to construct a parking lot for Bldg. 48 on appellant's own property. Yount also indicated that the cost for that construction would be approximately $18,620. Appellant also introduced testimony by representatives of Ohio Edison that it would cost an additional $3,471 to move a transformer located in an area of the proposed construction. Appellee contended that the cost for construction would not exceed approximately $11,000, and claimed that appellant made a similar admission in its May 13, 1993 board meeting. Appellee also introduced construction estimates for $6,000 and $9,500. In addition, appellee presented evidence that the transformer would not have to be moved, and argued that it would cost $4,000 to resurface Lantern Lane. Finally, appellee presented evidence that locating a parking area on appellant's own land would increase the value of Bldg. 48, because residents would no longer have to walk from the back of their units (from Lantern Lane) to their front door. The facts also indicate that decks on Bldg. 48 extend into Lantern Lane and, finally, that relocating the parking spaces to appellant's property would decrease grassy areas near the condominium units.
At trial, appellee called Ted McManus ("McManus"), an expert appraiser, who testified that appellee's property would be virtually worthless if an easement was granted. McManus further testified that Lantern Lane's highest and best use would make that property worth $42,000, if free from an easement. McManus also testified that relocating the parking area to the front of Bldg. 48 would increase the value of the entire building by approximately $6,000 to $12,000.
On July 16, 1986, appellee filed a complaint seeking a temporary restraining order, a preliminary and permanent injunction, ejectment, and damages against appellant. Appellee alleged that appellant was trespassing on appellee's 4.69 and .758 acre parcels in Bazetta Township. On December 21, 1992, appellant filed a counterclaim alleging that it had a right to an easement on Lantern Lane. Ultimately, as indicated previously, the case was bifurcated, and proceedings began on appellant's counterclaim.
On the first day of the magistrate's hearing, appellant moved to amend its counterclaim (that it had an easement by prescription) to assert a claim that it had obtained an "implied easement from an existing use." The magistrate granted appellant's motion. On November 30, 1995, Magistrate Anthony Cornicelli issued his "Findings of Fact and Conclusions of Law" ("Magistrate's Findings"), in which he concluded that appellant failed to satisfy all of the elements of an implied easement from an existing use. On December 12, 1995, appellant filed objections with the trial court in regard to the Magistrate's Findings. The trial court overruled appellant's objections and adopted the Magistrate's Findings in its entirety, on April 4, 1996. Thus, judgment was granted in favor of appellee on appellant's counterclaim.
From January 6-14, 1997, a jury trial was held before the Trumbull County Court of Common Pleas on appellee's amended and supplemental complaints for damages from appellant's trespasses on the 4.69 acre parcel and Lantern Lane. During the trial, appellant made two motions for a directed verdict on the issue of punitive damages. The trial court overruled both of those motions. On January 14, 1997, the jury awarded appellee $26,831 in compensatory damages and $108,500 in punitive damages.
On January 21, 1997, appellant filed a motion for judgment notwithstanding the verdict, new trial or remittitur. On February 12, 1997, appellant filed this appeal. On July 8, 1997, the trial court filed an "Amended Final Judgment and Order," in which it entered a remittitur reducing the jury award of punitive damages from $108,500 to $36,167 and permitted appellee to exercise its right to a new trial on both the actual and punitive damages within twenty days of the filing of that judgment entry. On August 8, 1997, appellee filed an appeal with this court from the trial court's July 8, 1997 judgment entry. On October 7, 1997, appellant and appellee agreed to consolidate their separate appeals for the purposes of briefing, oral argument, and disposition.
Appellant timely filed a notice of appeal asserting the following assignments of error:
 "[1.] The Trial Court erred as a matter of law to the prejudice of Appellant-Ivy Hill in denying Appellant-Ivy Hill's motions for a directed verdict on the issue of punitive damages.
 "[2.] The Trial Court erred as a matter of law to the prejudice of Appellant-Ivy Hill in denying Appellant-Ivy Hill's motion for judgment notwithstanding the verdict on the issue of punitive damages.
 "[3.] The Trial Court erred to the prejudice of Appellant-Ivy Hill in finding that the Appellant-Ivy Hill did not prove its Counterclaim for an implied easement from an existing use."
Appellee timely filed the following assignment of error on cross-appeal:
 "The trial court committed prejudicial error and abused its discretion in granting a remittitur and ordering a new trial."
Appellant's third assignment of error will be addressed first. In appellant's third assignment of error, appellant argues that the magistrate correctly articulated the four elements necessary for an implied easement from an existing use, but erred by applying the test of strict necessity, rather than the test of "reasonably necessary for the beneficial enjoyment of the property." Finally, appellant argues that the misuse of that test by the magistrate was prejudicial to appellant.
In Ciski v. Wentworth (1930), 122 Ohio St. 487, paragraph one of the syllabus, the court set forth the four required elements to establish an implied easement from an existing use:
 "While implied grants of easements are not favored, being in derogation of the rule that written instruments shall speak for themselves, the same may arise when the following elements appear: (1) A severance of the unity of ownership in an estate; (2) that before separation takes place, the use which gives rise to the easement shall have been so long continued and obvious or manifest as to show that it was meant to be permanent; (3) that the easement shall be reasonably necessary to the beneficial enjoyment of the land granted or retained; (4) that the servitude shall be continuous as distinguished from a temporary or occasional use only." (Emphasis added.) See, also, Trattar v. Rausch (1950), 154 Ohio St. 286, paragraph five of the syllabus.
In Trattar, the court held that an implied easement will not be recognized even when a portion of the original property has been subjected to benefit another part, unless the use was "reasonably necessary to the enjoyment of the dominant estate; [though] convenience alone is not enough." Id. at 292. Furthermore, that court determined that the burden of proof is upon the party seeking the implied easement. Id. at 292-293. Finally, that court held that the existing use must be existing at the time of the severance of ownership in land. Id. at 291-292. In Ciski, the court provided guidelines for determining when an implied easement is reasonably necessary:
 "`In determining whether the facts of a particular case bring it within application of this rule, it is necessary to determine the extent of the use, the character, and the surroundings of the property, the relationship of the parts separated to each other, and the reason for giving such construction to the conveyances as will make them effective according to what must have been the real intent of the parties; the foundation of the rule being that there shall be held to have been included in the conveyances all the rights and privileges which were incident and necessary to the reasonable enjoyment of the thing granted, practically in the same condition in which the entire property was received from the grantor.
 "* * * `The rule has been asserted and is well supported that when a continuous and apparent easement or servitude is imposed by the owner of land upon one portion of it for the benefit of another portion, a purchaser at either a private or a public sale, in the absence of an express revocation or agreement on the subject, takes the servient property subject to the easement or servitude.'" (Emphasis added.) (Citations omitted.) Ciski, 122 Ohio St. at 495-496.
In the case sub judice, the magistrate determined that appellant's use of Lantern Lane was continuous, apparent, and permanent, but not "reasonably necessary." Thus, the magistrate determined that appellant failed to establish that it had acquired an implied easement from an existing use. Moreover, the record demonstrates that the trial court adopted the Magistrate's Findings in its entirety and, therefore, also concluded that appellant failed to prove that it had obtained an implied easement from an existing use. However, in determining whether appellant's use was reasonably necessary, the magistrate erred by applying the test of "strict necessity," which is used solely for analyzing an easement by "way of necessity."
The magistrate's faulty reasoning is first evidenced through his observation that "it is not entirely clear whether the Court [in Trattar] focused on the issue of an implied easement by way of necessity (which requires `strict necessity') or an implied easement from an existing use * * *." The magistrate's confusion resulted from the seemingly contradictory language used by the Supreme Court of Ohio in paragraphs six and eight of the syllabus in Trattar. In paragraph six of the syllabus, the court held that a use of one part of a piece of property "will not be recognized as an implied easement unless the use is reasonably necessary to the enjoyment of the dominant estate." Trattar, 154 Ohio St. 286, at paragraph six of the syllabus. Paragraph eight states the following:
 "8. An easement in the form of a way of necessity will not be implied, where there is available another way of ingress and egress to and from the land involved, even though such other way is less convenient and would necessitate the expenditure of an appreciable amount of labor and money to render it serviceable." (Emphasis added.) Trattar, 154 Ohio St. 286, at paragraph eight of the syllabus.
In reconciling the language contained in paragraphs six and eight of the syllabus in Trattar, the magistrate concluded that the Supreme Court's use of the phrase, "reasonably necessary," in paragraph six indicated that the court was addressing the issue of an implied easement from an existing use throughout that opinion. Thus, the magistrate reasoned that paragraph eight of the syllabus articulated the elements for determining when an implied easement from an existing use exists. Consequently, the magistrate erred in analyzing appellant's counterclaim by utilizing the test of strict necessity, articulated in paragraph eight of the syllabus in Tratter, rather than the "reasonably necessary to the beneficial enjoyment" standard discussed in Ciski, paragraph one of the syllabus, and Tratter, paragraph six of the syllabus.
In Trattar, paragraph eight of the syllabus, there is a reference to the court's analysis concerning an easement by a way of necessity. In Trattar, the court performed a thorough analysis of both an implied easement from an existing use and an easement by a way of necessity. Evidence of the Trattar court's dual analysis is referenced in many portions of the opinion, but is most clearly demonstrated by its transition paragraph which states, "[p]laintiffs having failed, then, to present facts sufficient to warrant the finding of an implied easement from an existing use, we come to a consideration of whether the facts * * * sustain [an easement by] a way of necessity." Trattar,154 Ohio St. at 293. Paragraph eight of the syllabus in Trattar refers to the court's analysis in regard to an easement by a way of necessity, not an implied easement from an existing use.
Additionally, it is obvious that the magistrate hybridized the tests when he decided against appellant's counterclaim:
 "Under the indicia set forth by the Ohio Supreme Court in Trattar, which requires the claimant to prove that the implied easement is reasonably necessary regardless of convenience or an expenditure of an appreciable amount of labor and money to render its property serviceable, the evidence in this case strongly preponderates that there are alterative [sic] means of providing ingress, egress and parking for the subject condominium owners of Building 48. Accordingly, the Magistrate concludes that Ivy Hill has failed to satisfy its burden * * *." (Emphasis in original.)
The alternative means discussion employed by the magistrate, as adopted by the trial court, is unequivocally a component of an easement by a way of necessity, and is not a required element in establishing an implied easement from an existing use. Thus, the hybrid approach utilized by the trial court, through the Magistrate's Findings, was substantively inappropriate and, hence, not a proper application of the legal test for the express type of easement form claimed by appellant in its counterclaim. The magistrate, himself, properly stated that "the necessity which is required to constitute an implied easement need not be extreme, the rule being that the vendee of land is entitled to those advantages incident to the enjoyment of the particular property for the particular purposes for which such property was designed."
For the foregoing reasons, appellant's third assignment of error is with merit. Appellant's first and second assignments of error are rendered moot pursuant to App.R. 12(A)(1)(c). Likewise, appellee's assignment on cross-appeal is rendered moot. Therefore, the judgment of the trial court is reversed, and this matter is remanded to the trial court, which may, in its discretion, submit this matter to the magistrate in order that his legal conclusions are reconsidered in accordance with the appropriate legal standard articulated in Tratter. ________________________________ PRESIDING JUDGE DONALD R. FORD
CHRISTLEY, J.,
O'NEILL, J., concur.